■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NELSON RODRIGUEZ, Appellant.—Judgment, Supreme Court, Bronx County (Fred W. Eggert, J.), rendered January 29, 1988, convicting defendant after a jury trial of two counts of murder in the second degree (Penal Law § 125.25) and one count of attempted murder in the second degree (Penal Law §§ 110.00, 125.25), and sentencing him to two consecutive indeterminate terms of from 25 years to life for the murder convictions, and a term of from 8⅓ to 25 years for the attempted murder conviction, this last sentence to run consecutively to the murder sentences, unanimously affirmed.

Order, Supreme Court, Bronx County (Fred W. Eggert, J.), entered July 29, 1988, denying the motion by defendant to vacate the judgment of conviction pursuant to CPL 440.10, unanimously affirmed.

Around midnight of June 14, 1986, Luis Barrios and his girlfriend, Jacqueline Cardona, were met by the defendant, Alberto Quinones, Pedro Estrada and Luis Diaz at a location

in The Bronx.* The group drove to Mr. Barrios' apartment at 2319 Cambreleng Avenue in The Bronx. When they arrived, Estrada ordered Ms. Cardona into the apartment at gunpoint and she noticed that defendant and Quinones also had guns and that Barrios had been struck on the eye.

Inside the apartment, Esther Rodriguez, Mr. Barrios' other girlfriend, was lying on the bed with a pillow over her head. The four men ransacked Mr. Barrios' apartment because, as stated by Quinones, they were "looking for some money that Louie [Barrios] owes Nelson [defendant]". Defendant took some rings from Ms. Rodriguez and accused Barrios of stealing from him and hiring a man named "Chacho" to have him killed. Defendant gagged Ms. Cardona because she "[knew] too much" and tied Ms. Rodriguez' hands and Ms. Cardona's hands behind their backs with electrical cord. Quinones guarded the two women at gunpoint while the other three men went out to find Chacho. Several hours later, defendant and the others returned to Cambreleng Avenue but Mr. Diaz refused to go upstairs to Mr. Barrios' apartment. When Diaz told defendant they should leave, defendant replied, according to Diaz: "I got to take care, I got to take care of them, get rid of them". Defendant then went up to the apartment and told the others "to make it look like a robbery". Quinones shot Ms. Cardona and Ms. Rodriguez two times each in the head, killing Ms. Rodriguez but leaving Ms. Cardona alive but seriously wounded. Ms. Cardona heard the defendant, who was in the next room, state "Now it's your turn" and two more shots rang out. When police officers arrived on the scene, they found Ms. Rodriguez and Mr. Barrios shot dead in the bedroom and bathroom, respectively. The officers also noticed that the apartment had been ransacked and they could hear the stereo playing from outside the apartment. Thereafter Diaz, after watching a news report of the killings, met with the defendant to find out what had happened and defendant stated "He owed me a lot of money. He had it coming to him. Remember, its business. I have to take care of this". A day or two later, Diaz met with the defendant, Estrada and Quinones and heard each of the three confirm that they had shot one or more of the victims.

Defendant's major claim is that he was improperly denied

---

* Quinones was tried with defendant and convicted of two counts of murder in the second degree and one count of attempted murder in the second *degree. His* appeal has not yet been perfected. Estrada was indicted but not apprehended to date. Diaz pleaded guilty to manslaughter in the second degree and testified as a People's witness at defendant's trial.

access to files maintained by the Federal Drug Enforcement Administration (DEA) which had been investigating defendant's heroin distribution organization, of which Diaz was the bookkeeper while also serving as a confidential informant to the DEA, under the authority of *People v Rosario* (9 NY2d 286) and *Brady v Maryland* (373 US 83). It is undisputed that the State prosecutor never possessed, controlled or had even seen the Federal file in question. The DEA consented to have the court examine the files in camera and the court found therein no statements of the witness Diaz which were relevant to the instant trial.

It is elementary that in order to be deemed *Brady/Rosario* material *(see also,* CPL 240.45 [1] [a]), that material must be within the possession, custody or control of the People and when the material at issue is not within the People's control, the rules of *Brady (supra)* and *Rosario (supra)* are not violated. *(See, Morgan v Salamack,* 735 F2d 354, 358-359; *People v Tissois,* 72 NY2d 75, 78.) The prosecutor herein had no notes or access to notes of conversations between Mr. Diaz and the Federal authorities and had never seen the files at issue. Moreover, State courts are without authority to compel production of such files without the Federal Government's consent. *(Touhy v Ragen,* 340 US 462.) Accordingly, the prosecutor could not be held responsible for not producing a file which he had never possessed or seen, and which neither he nor the State courts could gain access to without the consent of the appropriate Federal agency. In fact, this court had only been permitted to review the files in question with the Government's consent, and with a Government agent present. *(Compare, People v Jones,* 70 NY2d 547, wherein it was held reversible error when the People failed to turn over to the defense five pages of notes written by the Trial Assistant concerning Juan Taza, an admitted former narcotics dealer who had become a paid confidential informant for the DEA, and a DEA-6 form containing an initial debriefing of Taza conducted by Detective Gerhold. That case is distinguishable in that the materials in question were in the People's possession, whereas here they are not.)

We have examined defendant's other contentions and find in each instance that they were not preserved by timely and specific objections, and that even if the issues were reached in the interests of justice, that no errors occurred. We further find with regard to defendant's other assertions of error (with the exception of his double jeopardy claim which we find to be without merit) that even if there were error, there is no

significant probability that the conduct and evidence complained of would have resulted in an acquittal in view of the overwhelming evidence of defendant's guilt. *(People v Johnson,* 57 NY2d 969; *People v Crimmins,* 36 NY2d 230.)* Finally, with regard to defendant's contention that the trial court abused its discretion when it denied his motion to vacate the judgment of conviction pursuant to CPL 440.10 on the basis of newly discovered evidence, and the People's alleged failure to disclose *Brady* material, we find that the newly discovered evidence was merely contradictory and impeaching of testimony presented at the trial and was not of such a character that it was probable that the jury would have returned a verdict of acquittal, and we accordingly affirm that order also. *(People v Powell,* 96 AD2d 610.)* Concur—Murphy, P. J., Kupferman, Carro, Kassal and Wallach, JJ.