[672 NYS2d 63]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MARIELLE KRONBERG, ROBERT PRIMACK and LYNNE SPEED, Respondents.

First Department, April 23, 1998

*Christine Duisin* of counsel, New York City (*Edward D. Saslaw* and *Victor Genecin* on the brief; *Dennis C. Vacco, Attorney-General,* attorney), for appellant.

*Susan C. Wolfe* and *David M. Greenberg* of counsel, New York City (*Hoffman Pollok & Pickholz, L. L. P.,* attorneys), for respondents.

## OPINION OF THE COURT

SULLIVAN, J. P.

The People appeal from two orders, the first of which, entered on or about February 16, 1995, vacated the convictions, after jury trial, of all three defendants of scheme to defraud in the first degree (Penal Law § 190.65) and, with respect to defendant Primack, the additional conviction of the crime of conspiracy in the fifth degree (Penal Law § 105.05 [1]) on the ground that the People, in the trial of this matter, violated their *Rosario* obligations.

In its second order, entered on or about December 1, 1995, the trial court held that, had defendant Kronberg's conviction not already been vacated by the order of February 16, 1995, it would vacate the conviction on the additional, independent ground that, at trial, her use immunity had been violated. Defendant Kronberg purports to cross-appeal from certain aspects of the court's rationale underlying its December 1, 1995 order that she views as adverse to her. Kronberg is not aggrieved by that order, and there is no provision in CPL article 450 authorizing such an appeal (*see, People v Laing,* 79 NY2d 166; *People v Goodfriend,* 100 AD2d 781, *affd* 64 NY2d 695), and we dismiss it.

The defendants were convicted after a nearly four-month trial at which the People presented the testimony of 24 witnesses showing that defendants had used deceptive practices to solicit loans on behalf of various corporations that were part of the Lyndon LaRouche organization. In procuring these loans, the defendants promised high rates of return, knowing that

the particular borrower corporation was not making a profit and that the demands of prior lenders for repayment were not being honored.

While defendants Primack and Speed were sentenced, Kronberg's sentence was held in abeyance pending disposition of a pretrial motion she had made for dismissal of the indictment based on an alleged violation of grants of use immunity she had received in connection with her compelled testimony before a Federal Grand Jury in the Eastern District of Virginia investigating the Lyndon LaRouche organization and at the subsequent trial of LaRouche in the United States District Court. The trial court had directed that a hearing be held on that issue in the event Kronberg were found guilty. After the guilty verdict and during the pendency of the alleged violation-of-use-immunity hearings, which were held over a period of three and one-half years, the three defendants moved pursuant to CPL 440.10 (1) (f) to vacate their convictions for alleged *Rosario* violations. Since Kronberg had never been sentenced on the jury's guilty verdict, the trial court deemed her motion a CPL 330.30 application to set aside the verdict. After a hearing, the court, as noted, finding *Rosario* violations, vacated the convictions of all three defendants. It subsequently vacated Kronberg's conviction on the additional ground that the People failed to prove that their evidence was not derived from her Federal immunized testimony.

The Federal use-immunity statute, 18 USC § 6002, provides, in pertinent part, "[N]o testimony or other information compelled under [an] order [granting use immunity] (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." Once a defendant presents evidence that he or she has been immunized, the prosecution must shoulder "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." (*Kastigar v United States*, 406 US 441, 461-462; *Braswell v United States*, 487 US 99, 117.) Such a showing is required with respect to "any use, direct or indirect, of the compelled testimony and any information derived therefrom." (*Kastigar v United States, supra,* at 460.) This burden "is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." (*Supra,*

at 460; *United States v Nanni*, 59 F3d 1425, 1432 [2d Cir], *cert denied* 516 US 1014.) "Neither [the] mere 'assertion that the immunized testimony was not used' nor even proof that the prosecutor 'had no direct or indirect access to the grand jury minutes' is sufficient." (*Supra,* at 1432, quoting *United States v Nemes*, 555 F2d 51, 55 [2d Cir].) The burden, however, is not insurmountable. (*United States v Nanni, supra,* at 1432.) In that regard, the court must determine whether the prosecutors would have taken the same steps " 'entirely apart from the motivating effect of the immunized testimony.' " (*Supra,* at 1432, quoting *United States v Biaggi*, 909 F2d 662, 689 [2d Cir], *cert denied* 499 US 904.) If they would have taken such steps, there is no violation of the defendant's Fifth Amendment rights.

A summary of the evidence adduced at the *Kastigar* hearing follows. Four witnesses, Virginia Assistant Attorney General (AAG) John Russell, Assistant United States Attorney (AUSA) Kent Robinson, and New York Assistant Attorney-Generals (AAG) Dawn Cardi and Rebecca Mullane, testified for the People, who also presented documentary evidence, including transcripts of the New York Grand Jury proceedings that led to the underlying indictment and transcripts of Kronberg's use-immunized testimony, both before the Federal Grand Jury and at the trial in the District Court.

The transcripts of the New York Grand Jury proceedings showed that the Grand Jury presentation of the instant case was completed more than three months before Kronberg gave her first immunized testimony to the Federal Grand Jury. These transcripts contain the testimony of seven persons who advanced loans to LaRouche corporations and show that, well before Kronberg gave her immunized testimony, the People had extensive evidence that she was actively involved in loan solicitations at a time when she knew that earlier loans were in default, that she had signed promissory notes knowing that the LaRouche corporations needed to borrow from one another to repay their loans.

Kronberg testified before the Federal Grand Jury on December 16, 1987, February 25 and June 21, 1988 and at the LaRouche trial in the Federal District Court on December 1, 1988 as to her role in the early stages of the loan system and in a LaRouche entity known as New Ben Franklin Publishing House (Publishing House) and its publication of a book, Dope, Inc., which was used in the fundraising efforts. She admitted to signing promissory notes, knowing of the organization's

expanding loan problems, and also testified about the blurring of the various LaRouche corporate entities. She was unable, she testified, to explain Publishing House records after the date in 1982 when Richard Welsh, an accountant for the LaRouche organizations, who was indicted on February 17, 1987 by a State Grand Jury in Virginia, took over its financial control. As the available New York Grand Jury transcripts show, these subjects were well known to the New York authorities long before Kronberg's first appearance before the Federal Grand Jury and were thoroughly presented to the New York Grand Jury. Both Elizabeth Sexton and Florence Dean, lenders, testified before the New York Grand Jury that they had loaned money for the publication of Dope, Inc. In both the Federal Grand Jury proceedings and Federal trial, Kronberg testified about the organization's support of LaRouche's living expenses.

In 1986, AUSA Robinson of the Alexandria, Virginia, office became involved in an investigation of the financial operations of the LaRouche organizations. At about the same time, John Russell, a Virginia AAG, was conducting a more narrowly focused State investigation, concerned primarily with the loan process. Although there was some overlapping in the investigations, Russell was cooperating with ongoing Federal investigations in Massachusetts and Virginia. He testified, as did Robinson, that on October 5 and 6, 1986, as the result of the execution of both Federal and State search warrants at LaRouche offices in Virginia, agents seized approximately 400 boxes of documents, including a November 24, 1981 letter from Kronberg to "Dear Lyn" and 3,000 separate loan files relating to LaRouche fundraising activities and documenting the issuance to various lenders of promissory notes, including those signed by Kronberg on behalf of Publishing House. Sometime in December 1986, Russell met with New York AAG Katherine Law, at her request, to discuss, in general terms, their respective investigations. At that time, Law decided not to use any of the documents and evidence seized in the earlier searches.

At around the same time, on December 16, 1986 and one month later, on January 16, 1987, the New York Grand Jury heard from several witnesses, one of whom, Michael Hudson, testified that, in December 1980, LaRouche members acquainted him with Publishing House, described as debt free, and that, after he, his attorney and Kronberg met, he agreed to loan $75,000 to Publishing House in exchange for three three-month notes dated January 21, 1981, each in the amount

of $25,000 and bearing a 20% interest rate. He further testified that Kronberg, in his presence, signed the notes, UCC forms, loan statement and collateral security agreement. Although his attorney was to receive, as collateral for the loan, two groups of stock, the stock certificates were never delivered. Furthermore, Kronberg had advised him that he would receive repayment checks from other, more solvent LaRouche affiliates and, in fact, she signed about 14 checks, each of which was subsequently returned for insufficient funds, canceled endorsements or stopped payment. All the checks noted that they were issued for the Publishing House loan. Although Hudson was paid about $42,000 in interest and a portion of principal, an approximate $60,000 balance remains due. Hudson eventually met LaRouche at the latter's New York City apartment. In explanation of the defaults, LaRouche cited mismanagement in the running of his corporations. Hudson, insisting on repayment of the notes, declined LaRouche's invitation to convert his notes into stock in the corporations.

Another witness, Michael DiChiara, testified that he loaned $800 to the Independent Democrats for LaRouche campaign in 1983, for which he was given a one-month, noninterest, promissory note and that he only received, in repayment, two $100 checks, one in June and the other in September 1985. The balance was never repaid.

Harry Griffiths testified that, after being solicited by defendant Primack, he made a voluntary $1,000 donation through his Visa card in August 1983 and two subsequent ones in November 1983 and February 1984. In March 1984, after Griffiths had given the LaRouche organization his American Express card, which had a higher limit, the Executive Intelligence Review, another LaRouche entity, withdrew $5,000 from the account, for which Griffiths was given a lifetime subscription to its magazine. Responding to Griffiths' protests as to the taking of his money, Primack talked him into considering the $5,000 as a loan to Campaigner Publications, Inc., which was the beneficiary of the funds. Campaigner gave Griffiths a February 1, 1994, unsecured promissory note, which called for 10% interest semiannually. Neither interest nor principal was ever paid on the note.

In May 1984, the LaRouche campaign took $500 from Griffiths' Visa account without his permission. After complaining, he was assured that the money would be repaid the following month. It was not; instead, the organization took another $500 from the same account. The $1,000 was never returned or

credited to Griffiths' account. In a letter to Griffiths, Campaigner admitted owing him money.

In 1982, David William Brown, a subscriber to the Fusion Energy Foundation magazine, loaned $50 to the LaRouche presidential campaign for which he took a note. Ultimately, he loaned $10,000, in total, to Publishing House, receiving various notes, including one from Caucus Distributors, Inc. (CDI), signed by Kronberg. All he ever received on the notes were two interest payments of $300 each. In addition, in June 1984, he paid $1,600 in campaign flight charges through his American Express credit card, for which he received only $700 in repayment.

These presentations led to a March 3, 1987 New York indictment naming Primack and Kronberg as defendants and charging them with, *inter alia*, conspiracy in the fifth degree based on their offers of promissory notes by Campaigner, Caucus and Publishing House, each a New York corporation. They were also charged with a scheme to defraud in the first degree based on their taking of property through false representations concerning the "safety" of the notes and loans, which the defendants "intentionally failed to pay". On September 11, 1987, there was a third New York Grand Jury presentation, at which three other complaining witnesses, Andrew Prewitt, and the previously mentioned Sexton and Dean testified. As a result, on September 28, 1987, a superseding indictment was filed adding Lynne Speed as a defendant and charging, *inter alia*, the same conspiracy and scheme to defraud. A transcript of that Grand Jury proceeding is not part of this record. At the trial, six of the seven witnesses who testified before the Grand Jury testified for the People.

Significantly, Kronberg's immunized testimony contains no reference to the nine witnesses, Basil Hwochinsky, Janet Snowday, Edward Jenning, Anthony Kozak, Cecila Landegger, Peter Norman Rogers, Edward Jiminez, Vernon Gray and Kathleen Shanahan, who did not testify before the New York Grand Jury but subsequently did testify at the New York trial. Nor did she testify with respect to Jerry Corbin, Alice Kulyk and Gail Bardwell, who were prosecution witnesses in New York.

Evidence of the commingling of loan proceeds among the LaRouche entities was provided by Hudson, who, as a result of his dealings with Kronberg, as noted, loaned $75,000 to Publishing House, receiving repayment checks drawn on the account of Campaigner and bearing the notation, "[Publishing] House loan repayment," as well as a check from Publication

and General Management, Inc., another LaRouche corporation. When Hudson questioned Kronberg about this method of payment, she told him that he "would be getting a check from one of their other affiliates that had more money in their account than [Publishing] House did." Brown, another lender, provided further evidence of the interchanging relationship of the LaRouche corporations and Kronberg's signing of promissory notes. He testified on January 16, 1987, that he loaned $2,000 to Publishing House to publish books in Peru and later advanced an additional $4,500 to Caucus. Kronberg signed the note given to Brown to cover both loans. At the time, Publishing House was in default since April 2, 1981 on Hudson's $75,000 note.

There was also proof at the *Kastigar* hearing that two additional lenders who did not testify before the New York Grand Jury were known to the Attorney-General, the prosecutor in the underlying New York action, prior to the time Kronberg gave her immunized Federal testimony. AAG Cardi testified, supported by documentary evidence, that Thomas Morley, a lender, communicated with the New York Attorney-General's office as early as March 1987. Morley held a promissory note, dated April 7, 1984, and correspondence from Publishing House confirming the loan. Similarly, Lachlan MacKenzie had sent a letter of complaint to AAG Law, Cardi's predecessor, prior to Cardi's entry into the case in 1987. In fact, in the first of its *Kastigar* decisions, the trial court found that Kronberg's Federal Grand Jury testimony and trial testimony added nothing to what the New York prosecutors already knew, characterizing it as "unenlightening in the extreme."

Virginia AAG Russell and AUSA Robinson testified as to the joint State and Federal investigation of the LaRouche organization in Virginia. In June 1986, Robinson commenced the Federal investigation, which, long before Kronberg testified before the Federal Grand Jury, uncovered the interchanging of the various LaRouche corporations and commingling of funds under the umbrella of the National Caucus of Labor Committees (NCLC). Robinson used this information in support of the Government's October 1986 application, made more than one year before Kronberg's first appearance before the Federal Grand Jury, for a warrant to search the LaRouche offices in Leesburg, Virginia, which, when executed in conjunction with a warrant obtained by the Virginia Attorney General, led to the seizure of the more than 400 boxes of documents, including over 3,000 loan files.

The New York prosecutors did not see this evidence until the summer of 1988, when AAGs Cardi and Mullane met in Virginia with AUSA Robinson and Virginia AAG Russell, as well as AUSA John Markham, who, having prosecuted the LaRouche organization in Massachusetts, was assisting in the Virginia case. Although by this time Cardi and Mullane had already devised their trial strategy, they were hoping to find additional victimized lenders and LaRouche insiders to testify at the New York trial. Robinson made available all the evidence seized pursuant to the search warrants, leading Cardi and Mullane to other lender victims, previously unknown, and the existence of promissory notes signed by Kronberg, as secretary-treasurer of Publishing House, all of which they used in cross-examining her at the New York trial. Robinson was circumspect in his conversations with Virginia AAG Russell and Cardi because of the secrecy of the Federal Grand Jury investigation. He informed FBI agent Timothy Klund, the supervisor of the Federal investigation, and other agents that they were not to give Kronberg's Grand Jury testimony to the New York AAGs. And, although a transcript of Kronberg's immunized testimony was mistakenly sent to AAG Cardi, as the hearing court found, she did not read it.

At this meeting, AAG Russell gave Cardi and Mullane a November 24, 1981 Kronberg memorandum to Lyndon LaRouche, the "Dear Lyn" memo, which was used in the New York trial to demonstrate that Kronberg knew of and actively participated in the fraudulent loan scheme. Kronberg wrote of new loans being taken at a time when older debts were overdue and the use by fundraisers of Dope, Inc. and other publications as vehicles to obtain loans. In so doing, Kronberg identified the organization's best fundraisers and suggested ways in which to continue the loan process in the future.

AUSA Robinson testified that he prepared, for use in interviews with lender victims, a questionnaire, distributed nationwide during the spring or summer of 1987 to FBI and Secret Service agents, that was never supplemented or revised after Kronberg gave her immunized testimony. The completed questionnaire, part of the interviewing agent's report, the "302 Report", was filed with the loan documents provided by the lender. At the time of their Virginia visit in the summer of 1988, Cardi and Mullane were given access to the lender files, except for the 302 reports, and permitted to copy any document.

In 1988, Robinson asked supervising FBI agent Klund to review the search warrant material and the nationwide

interviews and provide a list of lenders with an evaluation of their potential as trial witnesses. According to Robinson, this list was compiled without any information from Kronberg's immunized testimony. During the New York AAGs' 1988 visit to Virginia, as an aid to their examination of the documents seized in the execution of the search warrants and the lender files, Klund gave Cardi a list of investors compiled by the FBI. This chart, referred to by the parties as the "Klund Chart," includes the name of the person who solicited each lender.

In her review of the documents, Cardi focused on those lenders solicited by the defendants in the New York case. From the Klund Chart and seized loan files, the New York AAGs learned of lenders Hwochinsky, Snowday, Jenning, Kozak, Landegger, Rogers, Corbin and Kulyk, all of whom testified at the New York trial. The New Jersey Attorney General's office, which was conducting its own investigation of the LaRouche organization and had obtained a computer printout of New Jersey victims from Federal investigators, gave Cardi the names of lenders Jiminez, Gray and Shanahan.

At the *Kastigar* hearing, AAG Mullane testified about a meeting that she and Cardi attended with AUSA Markham concerning the LaRouche organization. Markham furnished the New York AAGs with transcripts of the trial testimony of Chris Curtis and Welsh in the Massachusetts case as well as the 302 report on Curtis, which had been disclosed in the pending Federal trial in Massachusetts, and introduced them to Curtis, who testified at the New York trial about the national and New York regional fundraising operation and the structure of the LaRouche organization, as well as Wayne Hintz and Bardwell, and the respective functions of the individual defendants. Hintz, responsible for the organization's loan repayments, testified at the New York trial that by December 1985 the organization owed, on overdue loans, between $20,000,000 and $27,000,000, without the funds to repay them. Bardwell, a fundraiser at NCLC, testified at the New York trial with respect to the LaRouche organization's fundraising methods and Kronberg's admission that she could go to jail for her participation in them.

AUSA Robinson and Virginia AAG Russell testified that representatives of both offices interviewed Curtis before December 16, 1987, when Kronberg first testified before the Federal Grand Jury. Virginia investigators knew of Hintz in October 1986, shortly after the execution of the Federal search warrant, and had interviewed him prior to Kronberg's Grand

Jury testimony. Markham knew of Bardwell long before Kronberg gave her Grand Jury testimony. He also informed the New York AAGs about insider Vera Cronk, whose name appeared on the Klund Chart. AUSA Robinson testified that, before Kronberg gave her testimony, he knew about Welsh, the accountant for the various LaRouche organizations, from documents seized in the execution of the search warrant and had subpoenaed him to testify before the Federal Grand Jury.

AAG Cardi and AUSA Robinson also testified about their discussion in anticipation of Cardi's cross-examination of Lyndon LaRouche. Robinson stressed LaRouche's vulnerability as to expenditures made in his behalf by the various LaRouche corporations, especially in support of a farm in Virginia, where LaRouche often stayed. Robinson also referred Cardi to LaRouche's deposition in a civil case, *LaRouche v NBC*, and Welsh's trial testimony in the Federal action. The two prosecutors also discussed LaRouche's demeanor in testifying in those proceedings. As to the various subjects explored by her in her cross-examination of LaRouche at the New York trial, Cardi outlined the independent sources, including memoranda given her by Virginia State authorities from the documents seized in the October 1986 execution of the search warrant, insiders Bardwell and Cronk and LaRouche's deposition and trial testimony in various civil actions in which he was a party.

After completing their direct case at the *Kastigar* hearing and in response to Kronberg's argument that they had failed to meet their burden of proof, the People cross-moved to reopen their case to show an independent source for the trial testimony of Bardwell, who, as noted, had been introduced to them by AUSA Markham. Rejecting Kronberg's argument that not only were the People required to show an independent source for the evidence against her but also that her immunized testimony had not in any way influenced the prosecutors' thought processes in preparing for trial, the hearing court, in reliance on *United States v Rivieccio* (919 F2d 812 [2d Cir], *cert denied* 501 US 1230) and *United States v Mariani* (851 F2d 595 [2d Cir], *cert denied* 490 US 1011), held that a prosecutor may make nonevidentiary, tangential use of immunized testimony provided the evidence adduced at trial was obtained from a source independent of the immunized testimony. Citing *People v Corrigan* (80 NY2d 326, 330-331), the court further held that the mere possession and viewing of a defendant's immunized testimony did not constitute a "use" prohibited by either the State or Federal Constitutions. The court permitted reopening

of the People's case on the *Kastigar* issue and additional proceedings were conducted.

In its December 1, 1995 decision, which is, chronologically, the second of the two orders on appeal and followed the reopened hearing, the court, while finding the witnesses at the *Kastigar* hearing "[f]or the most part * * * credible and reliable," vacated Kronberg's conviction and granted her a new trial, holding that the People had failed to prove an independent source for 12 trial witnesses who had become known to the New York prosecutors only after Kronberg had completed giving her Federal Grand Jury testimony. The court reached this determination despite the fact that Kronberg never mentioned any of the 12 witnesses in her Grand Jury testimony and notwithstanding its finding that "for the most part the facts on which Ms. Kronberg's prosecution rested were known through the date of the completion of [the New York] grand jury proceedings * * * over three months [before] her appearance * * * before the federal grand jury."

The court also found that it could not determine whether any Klund Chart entries contained information stemming, either directly or indirectly, from Kronberg's immunized testimony. It further found that, from the Klund Chart and the loan files, AAG Cardi learned of six lender witnesses, Hwochinsky, Snowday, Jenning, Kozak, Landegger and Rogers, who later testified at the New York trial. It found that the names of LaRouche insiders Corbin and Kulyk appeared on the Klund Chart and that the New York prosecutors learned of three more witnesses, investors Jiminez, Gray and Shanahan, from the New Jersey Attorney General, who had obtained their names from a computer printout compiled by Federal prosecutors. The court found that the People failed to establish that the identity of the three witnesses obtained from the New Jersey Attorney General did not stem from Kronberg's immunized testimony. Finally, the court found that there was no evidence as to the source of the New York prosecutors' knowledge of Bardwell.

The motion to vacate defendants' convictions for *Rosario* violations was based on the failure to turn over the Klund Chart and the 302 reports, which, they allege, contain interviews with lenders who testified for the prosecution at the New York trial. Noting that the People failed to claim that the 302 reports as to the witnesses who testified at trial did not constitute *Rosario* material, the court ordered a hearing to determine the relationship between the Federal and New York

prosecutors, the reason why California prosecutors, and not New York's, were able to obtain the 302 reports and why the New York prosecutors failed to move in the Federal court in Virginia to compel the release of the 302 reports.

At the *Rosario* hearing, AUSA Robinson testified that he instructed Klund and other FBI agents to prepare a list evaluating potential witnesses. In responding to defendants' 440.10 (1) (f) motion, the People submitted Klund's affidavit, in which he explained the origin of the Klund Chart. Klund described the chart as an "internal working document used for trial preparation", compiled from information in the LaRouche organization loan files and computer records, as well as the 302 interview reports. Klund noted that the chart's right-hand side had been cut off during photocopying. Ultimately, the court directed that both a redacted and unredacted Klund Chart showing partial comments that had been cut off, as described by Klund, be shown to defendants.

In further support of their *Rosario* motion, defendants also alleged that the New York AAGs, who in the course of their investigation, had access to witness(es)' interview reports prepared by Federal agents (302 reports), should have obtained copies of those reports and made them available to them. AUSA Robinson testified extensively as to the relationship between his office and the various State law enforcement agencies investigating the LaRouche organization. The defendants offered two 302 reports, for witnesses Corbin and Hwochinsky, but no evidence was adduced to show the existence of 302 reports for the other lenders who testified at the New York trial. In fact, neither Robinson nor AAG Cardi was able to confirm the existence of 302 reports for the other New York witnesses.

Robinson explained the different levels of cooperation between his office and the Attorneys-General of New York and Virginia. He testified that Virginia was "much more of a partner in a cooperative effort" than was New York, whose relationship with the Federal Government, unlike that of Virginia, did not include the providing of any information to the United States Attorney. In fact, Robinson had nearly completed his investigation when AAG Cardi first contacted him. Although he felt duty bound to provide information that he was legally permitted to disclose, assisting the New York Attorney-General was, in Robinson's words, "a pain in the neck." He did give assistance but with "substantial limitations".

Robinson testified that he and AUSA Markham agreed to restrict the New York Attorney-General's access to their evi-

dence. When, in the summer of 1988, the New York AAGs visited, Robinson refused them permission to copy the 302 reports and denied them access to Federal Grand Jury testimony and exhibits, Internal Revenue Service tax material, Federal prosecutors' interim reports and 302 reports with respect to LaRouche organization insiders. Robinson told Cardi that if she wanted information about LaRouche's insiders she should attend the Federal trial. Once the insiders' identities and testimony were matters of public record, Cardi, Robinson testified, would be free to speak to them.

It was also disclosed at the *Rosario* hearing that on December 12, 1988, prior to the New York trial, Cardi wrote Robinson requesting the Federal Grand Jury minutes and 302 reports with respect to the potential New York witnesses. On December 14, 1988, Robinson replied, stating that he could not release Grand Jury minutes without a court order and advising that he would not release the 302 reports, which, as he was to testify at the *Rosario* hearing, were protected by the work product privilege.[1] Robinson also testified that 302 reports are not discoverable under Federal Rules of Criminal Procedure, rule 16; nor are they discoverable as witnesses' statements, as defined in the Jencks Act (18 USC § 3500), since they are neither signed nor affirmed by the witness.

Robinson also testified that, in the summer of 1988, the Los Angeles District Attorney commenced an investigation of the LaRouche organization and that he provided the same degree of cooperation with respect thereto as he did in the New York investigation. He allowed examination and copying of material and documents recovered in the execution of the search warrant, as well as examination, but not copying of, 302 reports concerning insiders or interim prosecution reports. As with the New York investigation, the Federal authorities never asked the Los Angeles prosecutor for assistance; nor did he provide any. Despite the limitations placed on them and without the Federal authorities' approval, the Los Angeles investigators apparently copied restricted documents. In 1992, during discovery in a civil action against the Los Angeles District Attorney, the plaintiff obtained 25 302 reports, including that with respect to Corbin, a prosecution witness at the New York trial. The plaintiff was also able to obtain pages of the Federal interim prosecution report. Robinson first learned of this

---

1. Production of such reports could not have been compelled by either subpoena or order of a New York State court. (*Touhy v Ragen,* 340 US 462; *People v Rodriguez,* 155 AD2d 257, *lv denied* 75 NY2d 923.)

breach of the restrictions placed on the Los Angeles prosecutor at the *Rosario* hearing.

At the *Rosario* hearing, both AUSA Robinson and AAG Cardi testified as to the limited assistance the Federal authorities provided the local prosecutors during the New York trial. As noted, Cardi called for advice in preparing her cross-examination of Lyndon LaRouche. Testimony of AAGs Cardi and Mullane from the *Kastigar* hearing, admitted by stipulation at the *Rosario* hearing, showed that during the New York trial they spoke, by telephone, a number of times with AUSA Markham as to the possibility of his testifying at the New York trial, and with Virginia State Police Officer Charles Bryant and Donald Moore of the office of the Loudon County Sheriff with respect to obtaining more legible copies of certain documents.

After an in camera review of the unredacted copy of the Klund Chart, received in evidence at the hearing on the foregoing issues, testimony by AUSA Robinson and the receipt in evidence of the *Kastigar* hearing testimony of AAGs Mullane and Cardi, as well as testimony of other witnesses relevant to the 302 report relating to Hwochinsky, the court vacated the convictions of all three defendants and ordered a new trial for *Rosario* violations. These violations were based on the People's failure to disclose the Klund Chart; to persuade the Federal authorities to create a "complete" Klund Chart and provide it to the New York prosecutors; and to create, by hand, verbatim copies of the 302 reports or to obtain the same from the Federal authorities and disclose them to defendants. This is the other order on appeal.

In explanation of its ruling, the hearing court found that the Klund Chart in the People's possession, although incomplete, contained a "Comments" section, which was computer generated from data appearing in the 302 reports with respect to each lender, including the 12 who testified at the New York trial, and contained, "in many instances, a direct quote from the lender * * * often cut off in mid-sentence." Thus, the court held that the chart, in the form in which the People had it, should have been turned over to the defense and that the People were obliged to secure from the Federal prosecutors a complete Klund Chart. The court also cited the New York prosecutors' failure to take notes of their prospective witnesses' statements from the 302 reports to which they had access. Noting that the California prosecutors were permitted to make photocopies of 302 reports, the court further found the People

had failed to explain "this quixotic disparity between the treatment accorded New York and California." Finally, in support of its theory of a "conspiracy" between the New York and Virginia prosecutors, the court noted that AAG Cardi "ignored the defendants' requests in January 1989 for the identity of her witnesses that had been interviewed by other agencies of law enforcement and concealed even the existence of the Klund Chart."

On the record before us, neither order is sustainable. Accordingly, we reverse, reinstate the convictions and, in the case of Kronberg, remand for sentencing.

■ In vacating Kronberg's conviction for a *Kastigar* violation, the hearing court found that the People failed to prove an independent source for each of the 12 trial witnesses whose identities became known to them after Kronberg gave her use-immunized testimony. The court cited the People's failure to show that the information contained in the Klund Chart did not stem, directly or indirectly, from Kronberg's immunized Grand Jury testimony and that there were independent sources for the witnesses named in the Chart. The court's ruling was based on the application of an improper burden of proof.

While *Kastigar* does not define the standard of proof in establishing that evidence has a source other than the immunized testimony, Federal appellate courts have, without exception, held that the People's burden is to show, by a fair preponderance of the credible evidence, the existence of an independent source. (*See, e.g., United States v North*, 910 F2d 843, 873 [DC Cir], *cert denied* 500 US 941; *United States v Hampton*, 775 F2d 1479, 1485 [11th Cir]; *United States v Byrd*, 765 F2d 1524, 1529 [11th Cir]; *United States v Contreras*, 755 F2d 733, 735 [9th Cir], *cert denied* 474 US 832; *United States v Rogers*, 722 F2d 557, 560 [9th Cir], *cert denied* 469 US 835; *United States v Seiffert*, 501 F2d 974, 982 [5th Cir].) Thus, the People need only show that, more likely than not, the evidence had a source independent of the immunized testimony. (*United States v Byrd, supra*, at 1529.) In our view, the People met that burden.

As shown by the transcript of Kronberg's immunized testimony, the People did not learn of the names of their witnesses from such testimony. Kronberg never mentioned these witnesses' names; nor, in any way, did she identify them. Moreover, the People showed an independent source for each of the witnesses. They learned of the identities of Hwochinsky, Snowday, Jenning, Kozak, Landegger, Rogers, Corbin and Kulyk

from the Klund Chart and the loan files seized by the Federal and Virginia authorities in the execution of the search warrant. They learned of Jiminez, Gray and Shanahan from the New Jersey Attorney General's office, which had obtained from Federal authorities a computer printout of that State's victims. AUSA Markham introduced Bardwell to the New York prosecutors.[2]

The hearing court's reasoning would require the prosecutor to prove that it could not have derived the names of these witnesses from Kronberg's testimony or from some use, real or theoretical, of that testimony, a burden which, it seems to us, is insurmountable. While the Klund Chart is the source for most of the witnesses, it does not, on its face, have any correlation to Kronberg's testimony. As for the FBI printout listing New Jersey victims, Kronberg's immunized Grand Jury testimony never mentions New Jersey or the three New Jersey witnesses called by the People at trial. As already noted, Bardwell, a LaRouche insider known to AUSA Markham, was neither named nor alluded to in Kronberg's Grand Jury testimony.

That the hearing court accepted the notion that defendant's immunized testimony may have "tangentially influenced" Federal prosecutors and investigators' thought processes, leading them to place the names of these witnesses on lists eventually shown to AAG Cardi, is of no avail, the courts having rejected such reasoning. (*United States v Rivieccio, supra,* 919 F2d, at 815; *United States v Mariani,* 851 F2d 595, *supra; United States v Catalano,* 491 F2d 268 [2d Cir], *cert denied* 419 US 825.) Additionally, acceptance of such reasoning would cast an almost impossible burden on the People, i.e., to prove a negative. In the absence of a showing that the People made any use of Kronberg's immunized testimony as an informational source leading to the discovery of other investigatory material, her use immunity has not been violated. (*See, People v Corrigan, supra,* 80 NY2d, at 330-331.) Nor does use immunity reach backward to affect evidence obtained prior to receipt of the immunized testimony. (*United States v Barber,* 668 F2d 778, 782 [4th Cir], *cert denied* 459 US 829; *see, United States v Provenzano,* 620 F2d 985, 1006 [3d Cir], *cert denied* 449 US 899.)

As this record shows, the New York Grand Jury presentation had been completed well in advance of the date Kronberg gave her immunized testimony, by which time the New York

---

2. AAG Ray Cerreta represented, on the record, that AUSA Markham would testify that he knew of Bardwell long before Kronberg testified under a grant of immunity.

prosecutors were in possession of information establishing Kronberg's involvement in every aspect of the fraudulent scheme proved at trial. MacKenzie and Hudson, lenders who testified before the New York Grand Jury, established Kronberg's extensive personal involvement in the fraud, including her knowledge of the LaRouche organization's loan defaults beginning as early as 1981.

Prewitt, a New York Grand Jury witness on September 11, 1987, testified at trial that in September 1982, in consideration for a loan he advanced in that amount, Kronberg, knowing at the time that Publishing House had defaulted on the MacKenzie and Hudson notes, signed a $16,000 promissory note. After telephoning him several times to get him to agree to the loan, she appeared at his door to drive him to the bank to withdraw the money. Thus, Prewitt's testimony, before the Grand Jury and at trial, established not only that Kronberg signed the notes as a corporate officer of Publishing House at a time when she knew of its inability to meet its loan obligations but also that she, in support of the organization's fraudulent scheme, diligently pursued potential lenders. Similarly, long before Kronberg gave her immunized testimony, the New York prosecutors knew of Morley, a lender, who had complained to the New York Attorney-General in March 1987 about a loan he had made that was never fully repaid. Brown, another lender, who testified before the New York Grand Jury on January 16, 1987, testified at trial that he lent Publishing House $2,000 at 10% interest in exchange for a promissory note, never repaid, bearing a facsimile of Kronberg's signature. Persuaded to roll the note over into a larger loan to cover both the $2,000 Publishing House debt and an additional $4,500 loan to CDI, another LaRouche corporation, Brown took CDI's note, which was never fully repaid, for the full amount of both loans.

Thus, the People knew from defrauded lenders MacKenzie, Hudson, Morley, Prewitt and Brown, long before Kronberg gave her immunized testimony, of her active and knowing participation in the scheme to defraud. In addition to that information, the Federal and Virginia authorities, pursuant to search warrants, the execution of which antedated Kronberg's first Federal Grand Jury appearance, had seized documentary evidence that included the November 24, 1981 "Dear Lyn" memorandum from Kronberg to LaRouche, given to the New York AAGs by Virginia AAG Russell, whose only discussion with the Federal authorities about Kronberg was limited to whether she had received immunity, and who had not seen her

Grand Jury testimony. Received in evidence at the New York trial, this memorandum was known to the Federal and Virginia authorities before Kronberg gave her immunized testimony. In the memorandum, Kronberg admitted that by the end of 1981 Publishing House's loan indebtedness was between $500,000 and $750,000 with debts still outstanding from 1978. In that same memorandum, Kronberg reported on new efforts, despite that debt, to raise more money on the pretext of their need for funds for publications.

In determining whether evidence discovered after the giving of use-immunized testimony is derived from that testimony, the critical question is whether, after the immunized testimony is given, "the witness and the prosecutorial authorities [are] in substantially the same position as if the witness had claimed the Fifth Amendment privilege" (*United States v Kastigar*, *supra*, 406 US, at 462). Here, the New York prosecutors, after Kronberg gave her immunized testimony, were in substantially the same position as if she had asserted her Fifth Amendment rights. They knew the dimensions of the scheme as it had an impact in New York and, as even the hearing court found, her testimony provided nothing new. Kronberg did not reveal any aspect of the scheme that the New York authorities did not already know; nor did she name or otherwise identify any witness that the People did not uncover as a result of their own contacts with various prosecutorial agencies. The documentation relating to all of the witnesses discovered by the People after Kronberg gave her immunized testimony was contained in the records of the LaRouche organization, seized by the Federal and Virginia authorities before her immunized testimony was given. Once it was established, as the hearing court found, that Kronberg's Grand Jury testimony added nothing to the People's knowledge of the case, the inquiry should have ended. In such circumstances, the People met their *Kastigar* burden. In view of our determination, we need not reach the People's argument that, if a *Kastigar* error occurred in this case, the use of Kronberg's immunized testimony was harmless in light of the substantial evidence they had amassed before and independently of that testimony.

■ The hearing court also erred in finding that the People's failure to disclose the 302 reports was a violation of their *Rosario* obligations and holding that the Klund Chart constitutes *Rosario* material. At the outset, we note that "the unambiguous terms of CPL 440.10 (1) (f) require that a defendant making a CPL 440.10 motion—preappeal or postappeal—seeking to

vacate a judgment of conviction on *Rosario* grounds demonstrate prejudice resulting from the violation." (*People v Machado*, 90 NY2d 187, 192.) This principle clearly applies to defendants Primack and Speed, both of whom, having been sentenced, are proceeding under CPL 440.10, and neither of whom has demonstrated, or could demonstrate prejudice in light of the substantial evidence introduced at trial that defendants committed a $32,000,000 fraud, even if the Klund Chart and such 302 reports as may exist constituted *Rosario* material. It should also be applied to Kronberg, whose purported CPL 330.30 motion was premised on the Klund Chart comments and 302 reports, matters outside the trial record. In fact, the Klund Chart was not discovered until the *Kastigar* hearing. Thus, even though Kronberg raises a *Rosario* issue before her direct appeal is exhausted she does so only in a de facto CPL 440.10 setting. The prejudice standard should apply equally to her *Rosario* claim.

In any event, the defendants had the burden, in the first instance, of proving that 302 reports existed. With the exception of witnesses Corbin and Hwochinsky, they failed to do so. They also had the burden, which they failed to meet, of showing that these reports, if they existed, were in the People's possession or control at the time of trial. The documents were in the possession of the FBI, which is not part of the State "law enforcement chain." (*People v Kelly*, 88 NY2d 248, 253.) The People never had possession of the 302 reports. AUSA Robinson, who limited New York AAG Cardi to taking notes of the names, addresses and telephone numbers of lenders, had precluded her from taking or copying the 302 reports. The record also reveals that the New York prosecutors were repeatedly rebuffed in their efforts to obtain the reports. Nor do the facts of this case warrant a finding of a joint Federal-State investigation. The Federal and Virginia State investigations were basically complete at the time the New York AAGs sought to examine the documents seized pursuant to the execution of their search warrants. Nor is there that close cooperation between the New York and Federal prosecutors in their investigation to warrant a finding of control or agency through the imputation of knowledge. (*See, United States v Paternina-Vergara*, 749 F2d 993, 998 [2d Cir], *cert denied sub nom. Carter v United States,* 469 US 1217.)

Moreover, unlike the usual circumstance in a *Rosario* claim, the defendants are not now in possession of statements that, they assert, should have been turned over earlier. There is no

evidence that resolves the issue of whether 302 reports exist for the other lenders who testified at the New York trial. At the *Rosario* hearing, AUSA Robinson, when asked whether AAG Cardi ever asked him for the 302 reports for Snowday, Hwochinsky, Prewitt or Morley, stated, "I don't recognize any of these names. I don't want my testimony to be interpreted to mean that there was a 302 on any of these people. I just don't know." Robinson also testified that Cardi did not ask him for 302 reports with respect to Brown, Kozak, Rogers or Kulyk. As to the latter witness, Robinson stated that he "probably looked at a 302." When asked, "Do you remember whose 302s you saw?", AAG Cardi, after admitting she saw one for a witness, Curtis, which had been turned over before trial to the defendants, responded, "If there was a 302 in there I read it, but I can tell you now if you went down the list of those witnesses we talked about earlier today, can I say whether or not each had a 302, I could not say that." Moreover, the record does not support the conclusion that any 302 report for a testifying New York witness, including Corbin and Hwochinsky, was in the witness files viewed by Cardi when she visited the FBI warehouse in Virginia.

These facts critically undercut the hearing court's conclusion that the New York AAGs had access to and used witness statements obtained by Federal investigators and then failed in their duty to disclose these statements to the defendants. The burden is on the defendants to show that the purported *Rosario* document was written by the witness or by someone who heard the statement and recorded it and that the statement was related to the subject matter of the witness's testimony. (*People v Lopez*, 196 AD2d 664, *revd on other grounds* 83 NY2d 994; *People v Miller*, 183 AD2d 790, *lv denied* 80 NY2d 907.) While such a showing has been made in the case of the 302 reports with respect to the witnesses Corbin and Hwochinsky, it has not been made concerning a 302 report for any other witness. Moreover, even in the case of Corbin and Hwochinsky, there is no showing at all that the New York AAGs ever saw their 302 reports or, as is required to trigger the People's obligation to produce material subject to the *Rosario* rule (*People v Kelly*, 88 NY2d 248, *supra; People v Howard*, 87 NY2d 940, 941), that they were ever in possession or control of them. Furthermore, the courts have refused to apply a theory of constructive possession to witnesses' statements in the possession of other City or State agencies not directly under the control of the prosecutor or the police. (*See, e.g., People v Kelly*, *supra; People v Washington*, 86 NY2d 189, 192.)

As the record shows, the 302 reports were in the possession of the United States Attorney for the Eastern District of Virginia, who denied the New York AAGs permission to do anything other than look at them. While there is evidence that the AAGs examined some 302 reports at a Federal warehouse in Virginia, there is no indication that they saw a 302 report for any witness called by them at trial. And, while the examined files may well have contained witnesses' statements, as noted, the AAGs were not permitted to copy any report that did or might contain such a statement. In any event, mere access to statements not in the People's control or possession does not trigger an obligation to produce under *Rosario*. (*People v Washington*, 196 AD2d 346, 351, *affd* 86 NY2d 189, *supra*.) The Federal authorities have consistently refused, to this day, to give the New York AAGs possession of any 302 reports. Furthermore, as AUSA Robinson testified, no Federal procedural device exists to compel the United States Attorney to release the 302 reports. State courts are similarly without authority to compel the Federal Government to produce documents, deemed discoverable under State law, which are under its control. (*Touhy v Ragen*, 340 US 462, *supra; United States v Paternina-Vergara*, 749 F2d 993, *supra; People v Rodriguez*, 155 AD2d 257, *supra*.) In such circumstances, there is no basis whatsoever for the hearing court's finding of a conspiracy between the New York authorities and Federal authorities in Virginia to deny defendants access to relevant evidence. Thus, the hearing court erred in holding that the 302 reports in the United States Attorney's possession constituted *Rosario* material that the People were obliged to obtain and turn over to defendants.

The hearing court also erred in holding that the Klund Chart, which, as the record shows, contains nothing concerning any of the 12 lenders who testified at the New York trial that can be described as a direct quote, constituted *Rosario* material. While some of the excerpted "Comments"—those as to Morley, Snowday, Hwochinsky and Kulyk—appear to be an abbreviated summary of interviews with them and are arguably *Rosario* material, the Comments section in every other case appears to be no more than a capsulized version of an evaluation of the witness's involvement. In the case of Snowday, the only Comments section being interpreted as susceptible of containing a witness's statement, the comment is cut off after the words, "[s]he stated she could not." The substance of what this witness may have stated is not indicated.

Instead of ruling, based on the circumstances and fragmented and incomplete documentation actually in the People's possession, that there was no *Rosario* violation, the hearing court, with no record support, found that the Klund Chart's Comments section is "what we now know to be a line generated by a computer storing the data that appears on the FBI 302 Reports for each lender." Given the absence from the record of 302 reports for 10 of the 12 New York witnesses, however, one can only speculate as to the source of the text in the "Comments" section of the Klund Chart.

In that regard, the two 302 reports that are part of the record, for Corbin and Hwochinsky, do not contain the fragmented text that appears for that witness in the Klund Chart. In Corbin's case, the Comments section of the Klund Chart reads, "Unauthorized charge on American Express in 1985 for $2,000-charge" while the relevant portion of the 302 report states: "According to CORBIN, he no longer has in his possession his American Express card, because it has been closed for a couple of years, but he advised that a $2,000.00 unauthorized charge was made against his card, by a travel agency, for travel from Upstate, New York to Paris, France. CORBIN advised he could not recall the date of the unauthorized charge or the organization charging the account, nor could he recall if in fact it was the LAROUCHE ORGANIZATION who made this unauthorized charge." Thus, there is no evidence to support defendants' suggestion, adopted, apparently, by the hearing court, that "the Klund Chart itself existed electronically in a form that would have reproduced the complete witness statements and that the People had an obligation to request the original, complete version."

In the absence of evidence that it reproduces witness statements, the Klund Chart should not be taken for more than it is—a list of LaRouche lenders, the name of the LaRouche representative who solicited the loan, a one-word appraisal of the lender's potential as a trial witness and an abbreviated comment about the information provided. A synopsis containing the interviewer's impressions is not subject to the *Rosario* rule (*see, People v Adger*, 144 AD2d 475, *mod on other grounds* 75 NY2d 723); nor is "a second-hand recording of a statement allegedly attributable to a prosecution witness, fraught with all the risks of inaccuracy and unreliability attendant to the relaying of what is essentially hearsay information" (*People v Williams*, 165 AD2d 839, 841, *affd* 78 NY2d 1087). Thus, it was error to hold that the Klund Chart constituted *Rosario* material.

Kronberg's challenge to the court's rulings with respect to the People's alleged use of her immunized testimony at trial is not cognizable on the People's appeal from the two orders vacating the convictions. (*See*, CPL 470.15 [1].) The issue may be raised on Kronberg's appeal from her conviction.

Accordingly, the orders of the Supreme Court, New York County (Stephen Crane, J.), entered on or about February 16, 1995 and December 1, 1995, should be reversed, on the law and the facts, defendants' motions to vacate their convictions denied, the convictions reinstated and, in the case of Kronberg, the matter remanded for the imposition of sentence. The purported cross appeal from the order of the same court and Justice entered on or about December 1, 1995 should be dismissed.

ROSENBERGER, NARDELLI, WILLIAMS and TOM, JJ., concur.

Orders, Supreme Court, New York County, entered on or about February 16, 1995 and December 1, 1995, reversed, on the law and the facts, defendants' motions to vacate their convictions denied, the convictions reinstated and, in the case of Kronberg, the matter remanded for the imposition of sentence. The purported cross appeal from the order of the same court and Justice, entered on or about December 1, 1995, dismissed.