Filed 6/17/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075381 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. SCS304369) |
| MARIO IVAN AGUILERA et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Reversed.

Summer Stephan, District Attorney, Mark A. Amador, Linh Lam, and Karl Husoe, Deputy District Attorneys, for Plaintiff and Appellant.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Respondent Mario Aguilera.

Elisa A. Brandes, under appointment by the Court of Appeal, for Defendant and Respondent Jesus Castaneda.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Respondent Ricardo Eaton.

Cathryn L. Rosciam, under appointment by the Court of Appeal, for Defendant and Respondent Daniel Gracia.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Respondent William Sherman.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Respondent Jose Villanueva.

The People, represented by the San Diego County District Attorney, appeal an order dismissing all criminal charges against defendants Mario Aguilera, Jesus Castaneda, Ricardo Eaton, Daniel Gracia, William Sherman, and Jose Villanueva. Defendants were charged with multiple felonies, including robbery (Pen. Code, § 211) and carjacking (*id*., § 215), arising from an aborted illegal drug transaction. The trial court found that defendants' constitutional right to due process was violated because the federal government refused defendants' requests to produce potentially exculpatory evidence in the possession of the U.S. Drug Enforcement Agency (DEA). We conclude that neither due process nor any other constitutional provision requires dismissal of the charges against defendants under the circumstances here. We therefore reverse the dismissal order.

FACTUAL AND PROCEDURAL BACKGROUND

*The Alleged Offenses*

For purposes of this section, we take the historical facts from the transcript of the preliminary hearing in this matter. At that hearing, the court heard testimony from the primary victim E.G., his son, and a police detective.

2

E.G. owned and operated a used car lot in National City, California. He was also involved in the cross-border drug trade between Mexico and the United States. Sometime in 2017, E.G. was threatened with federal prosecution, and he agreed to become an informant for the DEA. At the time, E.G. was involved with Aguilera in an effort to smuggle 200 kilograms of marijuana from Mexico into the United States. A person, whom E.G. did not know, provided the marijuana, and E.G. arranged to store the marijuana in Tijuana.

Once E.G. became an informant, the DEA told him to step away from the deal. They wanted him to focus on other, more consequential transactions. The marijuana was never transported into the United States. It remained in Tijuana and eventually went bad. Aguilera subsequently contacted E.G. and told him the person who provided the marijuana wanted to be paid for the loss. E.G. gave Aguilera a few used vehicles, which he thought would compensate the person.

Later, on January 8, 2018, E.G. received a call from an unknown man, who said he was interested in purchasing a used car E.G. had advertised online. E.G. invited the man to go to the used car lot, where one of E.G.'s employees would show him the car. An hour later, the man called again and confirmed he wanted to purchase the car. E.G. drove to the lot to complete this sale. He brought along his young son.

When E.G. arrived at the lot, his employee told him that the man was out getting some food and would be back soon. Several minutes later, the man returned with another person. E.G. later identified them as Gracia and Eaton, respectively. After E.G. spoke with Gracia briefly, two SUVs drove onto the lot. Six individuals exited the SUVs:

3

Aguilera, Castaneda, Sherman, Villanueva, a man identified as "Sergio," and an unidentified man. E.G. had employed Villanueva and Sergio at the car lot, and he knew Sherman as Villanueva's friend. (E.G. had stopped working with Villanueva several weeks earlier because he believed Villanueva had sold two trucks without permission and kept the money.) E.G. knew Aguilera, as discussed above, and they had been legitimate business associates as well for many years. E.G. was unfamiliar with Castaneda.

Gracia and Eaton grabbed E.G. from the back, and Eaton took E.G.'s cell phone. Either Eaton or Gracia had a gun. The other men approached quickly. Either Villanueva or Sherman, or both, held a large knife.

Aguilera introduced Castaneda as the person who had provided the marijuana that had languished in storage in Tijuana. Castaneda demanded money. He threatened to kidnap E.G. and take him to Mexico. But, when Castaneda saw E.G.'s son, he said, "You're in luck. Because your kid is here, we're not going to take you, but I want money."[1]

E.G. told Castaneda he did not have money, but Castaneda could take whatever he wanted from the lot. Castaneda said they would take the vehicles, but he still wanted the money in a couple weeks. The men drove some vehicles away, enlisted a tow truck to

---

[1] E.G.'s son was sitting in a truck on the lot using his cell phone. He saw a number of men approach his father. They were "grabbing [him] really hard in the jacket and . . . taking him somewhere." He tried to hide and call his mother, but Villanueva found him and took his cell phone. The men approached E.G.'s employee as well and took his phone and watch. Both were scared for their safety.

haul away some more, and retrieved others from auction lots. They eventually took several cars, SUVs, and vans, as well as at least one boat.

E.G. and his son left the lot in another used car. In the evening, E.G. called his DEA handler, Shawn Gaines. E.G. had been scheduled to meet with him that day. E.G. and Gaines agreed to meet the following day, along with another DEA agent, Mario Borboa. E.G. testified that he did not call the police because he wanted to talk to Gaines first.

The next day, E.G. met with Gaines and Borboa, as well as two other DEA agents. They spoke for approximately an hour or two. E.G. gave them a full report of the incident, including the names and descriptions of the people involved. At least one of the agents took notes of the conversation. E.G. did not know whether the conversation was recorded.

A few days later, Borboa arranged for E.G. to meet with a National City police detective. Borboa was acquainted with the detective because they had served together on the same task force. E.G. met with the detective and, according to him, provided the detective the same information he gave Gaines and Borboa. The detective interviewed E.G.'s son and his employee as well.

At the preliminary hearing, E.G. testified that his work as an informant involved setting up drug transactions with individuals specified by the DEA. E.G. made money on the transactions, but he was not paid by the DEA itself and did not receive any other benefits (except avoiding prosecution). He had a contract with the DEA, which he was

5

required to sign every three or four months. But by the time of the hearing, E.G. had let his contract expire.

*Proceedings on the Initial Charges and First Dismissal*

The district attorney charged defendants with robbery, carjacking, and other offenses. (*People v. Eaton* (Super. Ct. San Diego County, 2018, No. SCS298500); *People v. Castaneda* (Super. Ct. San Diego County, 2018, No. CS302785).) In advance of trial, the prosecutor contacted Borboa and requested a summary of benefits E.G. had received from the DEA. The prosecutor told Borboa that the information was relevant to E.G.'s credibility and the prosecutor was required to disclose it to comply with his *Brady* obligations. (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).) A DEA attorney responded by email and declined to provide the information. He advised the prosecutor that, under *United States ex rel. Touhy v. Ragen* (1951) 340 U.S. 462 (*Touhy*), he would have to comply with federal regulations to make a proper request. (See 28 C.F.R. § 16.21 et seq.) The attorney wrote that defense counsel was also free to submit a request.[2]

Separately, Sherman served two subpoenas on Borboa seeking testimony and various categories of documents relating to E.G.'s relationship with the DEA, the alleged offenses, and E.G.'s credibility generally. The DEA attorney responded that Sherman's

---

[2]    In *Touhy*, the United States Supreme Court considered whether the federal government could rely on its own regulations to refuse to comply with a subpoena or request for information. (*Touhy*, *supra*, 340 U.S. at p. 463.) The Supreme Court concluded that such regulations are valid and enforceable. (*Id*. at p. 468.) As discussed below, "If dissatisfied with the agency's response to the request, the defendant is not without recourse. The proper method for judicial review of the agency's final decision pursuant to its regulations is through the Administrative Procedure Act ('APA')." (*United States v. Williams* (4th Cir. 1999) 170 F.3d 431, 434 (*Williams*).)

6

request for information from the DEA would likewise have to comply with federal regulations under *Touhy*. Among other things, Sherman was required to submit an affidavit describing the relevance of the information sought. (See 28 C.F.R. § 16.22(c).) The DEA attorney stated that the U.S. Attorney's Office would review any proper request and authorize appropriate disclosures when warranted. He wrote, "If a party is dissatisfied with the government's response to a *Touhy* request, the party's remedy is an action against the relevant agency pursuant to the Administrative Procedures Act, and not pursuant to a motion to compel."

Sherman's counsel provided the requested affidavit. He described the alleged offenses, E.G.'s relationship to the DEA, and the fact that E.G. first reported the incident to the DEA.

Three weeks later, an Assistant U.S. Attorney informed Sherman's counsel by letter that the U.S. Department of Justice, of which the DEA is a part, would not authorize Borboa to testify and would not produce records in response to the subpoenas. The attorney wrote that "the records and testimony you are seeking implicate the existence or nonexistence of law enforcement investigations, and the existence or nonexistence of confidential source relationships. Furthermore, your request seeks information the disclosure of which would reveal investigatory techniques and procedures the disclosure of which would jeopardize their effectiveness. Accordingly, under 28 C.F.R. § 16.26(b)(4)-(5), disclosure will not be authorized." The attorney noted that Borboa's work is funded by taxpayers and "testifying in this state court criminal litigation would not be the best use of the [DEA's] limited resources." The attorney

7

informed Sherman's counsel that a state court subpoena cannot be enforced against a federal employee, and any attempt at enforcement would be removed to federal court.

Undeterred, Sherman sought and obtained a bench warrant from the trial court for Borboa's attendance. The U.S. Attorney's Office removed the subpoena proceedings to federal district court and filed a motion to quash. In a written order, the federal court granted the motion. It noted that the federal court's jurisdiction on removal is coextensive with the jurisdiction of the underlying state court, citing *FBI v. Superior Court of Cal.* (N.D.Cal. 2007) 507 F.Supp.2d 1082, 1092. It found that because the state court did not have jurisdiction to enforce a subpoena against the federal government, based on principles of sovereign immunity, the federal court likewise could not, citing *Elko County Grand Jury v. Siminoe* (*In re Elko County Grand Jury*) (9th Cir. 1997) 109 F.3d 554, 556 (*Elko County*). The federal court granted the motion to quash the subpoenas and dismissed the proceedings.

Back in the trial court, Sherman moved to dismiss the charges against him. He argued that his inability to compel Borboa's testimony and production of documents violated his constitutional rights, including the right to confrontation, the right to compulsory process, the right to effective assistance of counsel, and the right to due process generally. The remaining defendants joined in Sherman's motion.

In opposition, the prosecution argued that a criminal defendant does not have a general constitutional right to discovery. The disclosure of potentially exculpatory evidence in the possession of a government agency is governed by *Brady* principles. Under *Brady*, the prosecution is required to disclose material evidence in its own files as

well as others acting on its behalf. *Brady* did not compel testimony or production of documents from the DEA because the DEA was not working on behalf of the prosecution and was not part of the investigation of the defendants.

At the hearing on Sherman's motion to dismiss, the court heard testimony from the National City police detective responsible for the investigation. The detective said that Borboa called him on January 12, 2018, four days after the alleged offenses. Borboa had the detective's cell phone number because they had previously worked on the same task force, though never on the same case. Borboa gave the detective E.G.'s name and told the detective E.G. had been the victim of a crime. Borboa brought E.G. to a National City police station, where the detective interviewed him. Borboa was present for the detective's initial interview with E.G. From that point on, neither the DEA nor any other federal agency assisted the detective in his investigation of the offenses. Nor was the DEA or any other federal agency involved in any other investigations that aided the detective's investigation. The detective had not worked with Borboa or any other federal agent to gather facts or otherwise investigate the crimes.

After hearing argument, the trial court (Judge Theodore Weathers) granted defendants' motion to dismiss. The court noted that the prosecutor's efforts to obtain information from the federal government had been "exemplary" and the prosecutor "appears to have acted aboveboard at all times." The court believed, however, that "the issue here does rise to the level of a constitutional issue based upon due-process and the failure to provide the defendants with a right to a fair trial. And certainly their [Sixth] Amendment right to confront and cross-examine witnesses is implicated here. [¶] To

9

me, the [DEA] agent has critical information."  The court stated, "What, if anything, [E.G.] said to the federal agent in this court's mind is critical.  And what is also critical, as I inquired of the People, is the circumstances of the underlying drug transaction.  You know, what, if anything, did the DEA know about that?  Were they involved with it?"  After some logistical discussion, the court ordered, "These cases are dismissed, and the People can take whatever action or whatever remedies they feel appropriate, whether it be refiling the charges or whether by filing a writ.  You certainly have your recourses in this case.  [¶]  And I also want to state that this court does not dismiss charges like this lightly.  This court—I've been on the bench for almost 19 years now, and I have not confronted a situation where I've been so impressed with the issue that presents itself here with this fundamental fairness, where these defendants are absolutely precluded from cross-examining what everyone agrees is a critical witness here with critical information—with *Brady* information."

The prosecution filed a petition for writ of mandate in this court seeking reinstatement of the charges.  We summarily denied the petition because the prosecution had an adequate remedy by way of appeal.  (*People v. Superior Court* (*Eaton*) (Nov. 6, 2018, D074879).)  The prosecution did not appeal.

*Proceedings on the Refiled Charges and Second Dismissal*

Two days after the dismissal order, before filing its writ petition, the prosecution refiled charges against the defendants.  Defendants demurred to the criminal complaint on the ground that the prior dismissal barred refiling because it was based on a constitutional violation.  The trial court (Judge Weathers) overruled the demurrer.  It

10

stated, "[I]n this case the [c]ourt does agree with the prosecution that a demurrer is not the appropriate mechanism to deal with this issue that [defense] counsel is raising. With respect to the dismissal of the prior case on constitutional grounds, there is no defect on the face of the pleadings here. And therefore, in each of the defendants' cases, the demurrer is overruled." The prosecutor noted that his office was engaged in discussions with the federal government regarding the potential disclosure of DEA information.

The court (Judge Stephanie Sontag) held a preliminary hearing. The testimony elicited at the hearing has been recounted above. The court held defendants to answer on all charges, though it did not sustain certain firearm enhancement allegations against Gracia and Eaton. The prosecutor informed the court that his office's discussions with the federal government were ongoing.

Sherman again subpoenaed Borboa, as well as fellow DEA agent Gaines. Castaneda also subpoenaed Borboa and Gaines. By letter, the Assistant U.S. Attorney again informed defendants that the Department of Justice refused to provide the requested testimony and information. The attorney gave the same grounds as before: (1) the records and testimony implicate federal law enforcement investigations, confidential source relationships, and investigatory techniques and procedures; (2) testimony in this state court criminal litigation would not be the best use of the DEA's limited resources; and (3) a state court subpoena cannot be enforced against a federal employee.

Defendants moved to dismiss. They reiterated their argument that the federal government's refusal to allow testimony and document production by the DEA violated their constitutional rights. In opposition, the prosecution argued again that the defendants

11

had no general right to criminal discovery and *Brady* did not compel production of information in the hands of the federal government under the circumstances here.

The trial court (Judge Garry Haehnle) heard argument and granted the motion to dismiss. In its oral ruling, the court stated, "What really troubles this Court about this case . . . [is that the detective] testified that he did not speak to [E.G.] until the 12th, which was actually almost five days later, because this happened on the 8th and he spoke to him on the 12th. [¶] So what troubles me the most and which to me just doesn't pass the smell test is I have got this alleged victim who has these horrible crimes with the use of weapons . . . allegedly committed against him, and instead of running to the police like he should have, he runs to his handlers at the DEA, and it's then four or so days later that he makes contact with the police." The court was not concerned about E.G.'s history as a DEA informant. Instead, it was concerned about what E.G. told the DEA agents before he went to police. The court explained, "When I look at due process violations, I have to look at how it affects the defendant. And the defendants in this case don't have access to information that they should have access to to ensure that they are going to get a fair trial and make sure that the guarantees of the Sixth and Fourteenth Amendments are upheld. [¶] And . . . I understand the concept that this was the federal government [that] has stepped in and prevented the district attorney's office from getting that information. But it is the government. [¶] . . . [¶] And so I am going to grant the defense motion based on that and dismiss the case." The prosecution appeals.

12

DISCUSSION

I

*Procedural Bar Based on Refiling*

Before we consider the merits of the court's dismissal order, we must address a procedural bar raised by the defendants. They contend this appeal must be dismissed because the prosecution was barred as a matter of law from refiling charges against them after the first dismissal order. They do not cite any authority for the proposition that the appeal itself must be dismissed. The second dismissal order is an appealable order under Penal Code section 1238, and the prosecution is aggrieved by the order. (Cf. *People v. Punzalan* (2003) 112 Cal.App.4th 1307, 1310-1311 [dismissing appeal where city and police department were not aggrieved parties with standing to appeal].)

Defendants primarily rely on *People v. Pinedo* (2005) 128 Cal.App.4th 968, 970 (*Pinedo*), where the appellate court *affirmed* a second dismissal order on the ground that refiling the underlying charges was unauthorized. Defendants appear to argue, in the alternative to outright dismissal of this appeal, that the dismissal order here should be affirmed for the same reason. In *Pinedo*, the trial court's first dismissal was based on unreasonable prosecution delay resulting in actual prejudice. (*Id*. at p. 971.) The prosecution refiled the charges and did not appeal. (*Ibid*.) The trial court again dismissed the charges. (*Ibid*.) It reasoned that the "initial dismissal order was a final order terminating the prosecution, subject only to a successful appeal of the ruling." (*Ibid*.)

13

The appellate court agreed. (*Pinedo*, *supra*, 128 Cal.App.4th at p. 973.) It held that dismissal on certain constitutional grounds limited the prosecution's usual ability to refile: "[T]he United States Supreme Court determined by its decision in *Strunk v. United States* [(1973) 412 U.S. 434, 439-440], that the sole remedy for a violation of a defendant's right to a speedy trial is a dismissal with prejudice. Similarly, when the United States Supreme Court settled in its decisions in *United States v. Marion* [(1971) 404 U.S. 307, 324] and *United States v. Lovasco* (1977) 431 U.S. 783, 788-789, that a defendant has due process protection from unreasonable preaccusation delay, the court assumed, without any further discussion, that the same remedy applied to dismissals on due process grounds." (*Pinedo*, at p. 973.) It concluded that "a dismissal . . . on this due process ground terminates the proceedings and is an order that must be appealed or it becomes final." (*Ibid*.)

The bar to refiling in the circumstances identified in *Pinedo* stems from the "irreparable harm" caused by the delay. (See *United States v. Ray* (2d Cir. 2009) 578 F.3d 184, 191.) Once the delay has occurred, the prejudice to the defendant is complete. Refiling the charges cannot cure the prejudice or resolve the constitutional violation that led to the dismissal.

Here, by contrast, there was no finding of unreasonable preaccusation delay or violation of defendants' speedy trial rights. The due process violation identified by the trial court was based on the defendants' inability to obtain information from the federal government. The harm alleged by defendants, and found by the trial court, was not irreparable. It could have been resolved in further proceedings after the prosecution

14

refiled charges. Indeed, both the prosecution and defense counsel made efforts during the refiled proceedings to obtain the information at issue. *Pinedo* does not apply.

In addition to *Pinedo*, defendants rely on a number of authorities, but they all involve speedy trial violations or unreasonable preaccusation delay. (*People v. Boysen* (2007) 165 Cal.App.4th 761, 771 (*Boysen*) [preaccusation delay, bar to refiling not at issue]; *People v. Abraham* (1986) 185 Cal.App.3d 1221, 1224 [preaccusation delay, bar to refiling not at issue]; Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2019) § 19.37 [speedy trial].) Again, the dismissal here was based on a due process violation other than a speedy trial violation or unreasonable preaccusation delay. Defendants have not shown that a dismissal on the specific due process ground at issue here bars refiling in all circumstances or that the prosecution was barred from refiling charges under the circumstances here.[3]

## II

### *Due Process Violation: Standard of Review*

On the merits, the district attorney argues that the trial court erred by finding a due process violation and dismissing the charges. The parties dispute the applicable standard

---

[3]     Castaneda cites *People v. Sanchez* (2019) 41 Cal.App.5th 261 for the proposition that charges dismissed on due process grounds cannot be refiled. *Sanchez* does not stand for that proposition. It held, instead, that Penal Code section 871.5 did not empower a court to reinstate charges dismissed on due process grounds because those grounds are not enumerated in the statute itself. (*Sanchez*, at p. 266.) The court explained, "We have no doubt that Sanchez's motion to dismiss for vindictive prosecution was made and decided as a matter of constitutional due process. Such a dismissal is not one of the enumerated orders that may be reviewed pursuant to section 871.5, and we cannot add it." (*Id*. at pp. 267-268.) The constitutional limitation on the prosecution's ability to refile charges, when otherwise allowed by statute, was not at issue in *Sanchez*.

15

of review.  Defendants argue for abuse of discretion or substantial evidence, and the district attorney for a de novo standard.  We conclude the ultimate issue presented in this appeal is a mixed question of law and fact that is predominantly legal.  We therefore apply the de novo standard of review to the issue of whether due process precludes prosecution of the defendants under the circumstances here.

"The standards of review for questions of pure fact and pure law are well developed and settled.  Trial courts and juries are better situated to resolve questions of fact, while appellate courts are more competent to resolve questions of law.  Traditionally, therefore, an appellate court reviews findings of fact under a deferential standard (substantial evidence under California law, clearly erroneous under federal law), but it reviews determinations of law under a nondeferential standard, which is independent or de novo review."  (*People v. Cromer* (2001) 24 Cal.4th 889, 893-894, fn. omitted.)

"Mixed questions of fact and law 'are those "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant legal] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." [Citation.]' [Citation.]  The review of mixed questions thus involves a two-step process of first determining the facts relevant to the issue being decided and then applying the law to those established facts. [Citation.]  Deference is given to the trial court in considering the relevant factual findings:  ' "[T]he power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court.

16

On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." ' "  (*People v. Uribe* (2011) 199 Cal.App.4th 836, 855-856 (*Uribe*).)

"The Supreme Court has explained that 'California and federal cases have deemed the independent review standard appropriate for a diverse array of mixed law and fact questions, often on the ground, among others, that such questions were constitutionally significant and/or "predominantly legal." ' "  (*Uribe*, *supra*, 199 Cal.App.4th at pp. 856-857.)  "[I]t is not universally true that the second step is subject to independent review in a mixed question case.  [Citation.]  But whether an independent or more deferential review standard is applied 'is influenced in part by the *importance of the legal rights or interests at stake*.  [Citation.]'  [Citations.]  Further, 'independent appellate review of a mixed law and fact question is crucial when an excessively deferential appellate affirmance risks error in the *final determination* of a party's rights, either as to the entire case, or on a significant issue in the litigation.' "  (*Id*. at p. 857.)

Thus, in *Uribe*, the appellate court applied the de novo standard of review to a trial court order granting a nonstatutory motion to dismiss based on outrageous governmental conduct in violation of due process.  (*Uribe*, *supra*, 199 Cal.App.4th at p. 858.)  Similarly, in *People v. Salazar* (2005) 35 Cal.4th 1031, 1042, our Supreme Court applied the de novo standard of review to a *Brady* claim, i.e., the denial of due process based on governmental nondisclosure of material exculpatory evidence.

17

Here, the district attorney appeals a nonstatutory dismissal order based on due process, as in *Uribe*. The alleged due process violation was based on nondisclosure of evidence, as in *Salazar*. The ultimate issue in this appeal is whether prosecution of the defendants under the circumstances here violates their right to due process of law. Resolving this issue primarily requires us to interpret the guarantees of due process in this context, which is a legal question. And, it is undisputed that this issue implicates important legal rights and interests, i.e., the constitutional rights of the defendants and the district attorney's interest in prosecuting alleged wrongdoing. (See *Uribe*, *supra*, 199 Cal.App.4th at p. 858.) It is also outcome-determinative. It is therefore properly subject to de novo review.

To justify review for substantial evidence, defendants again rely on authorities considering preaccusation delay or speedy trial violations. (See *People v. Mitchell* (1972) 8 Cal.3d 164, 167; *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1330; *Boysen*, *supra*, 165 Cal.App.4th at p. 777; *People v. Conrad* (2006) 145 Cal.App.4th 1175, 1184.) These authorities hold that it is a question of fact, for determination by the trial court, whether the delay is unreasonable and prejudicial. This question is not analogous to the question presented in this appeal, which primarily concerns the scope of the due process right itself.

To justify review for abuse of discretion, defendants invoke the rule that dismissal orders under Penal Code section 1385 are generally reviewed under that standard. (See *People v. Carmony* (2004) 33 Cal.4th 367, 374; *People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.) This rule is inapplicable because the dismissal order here

was not based on section 1385.  However, even if the statute were applicable, the underlying basis for the court's dismissal order was its interpretation of the right to due process.  Because this interpretation is a legal matter, we review the underlying basis of the court's order de novo.  (*Pedroza*, at p. 650.)  Even if we were to apply the abuse of discretion standard of review, the dismissal order was based on an incorrect legal standard, which was prejudicial to the prosecution, and it was therefore an abuse of discretion.  (See *Uribe*, *supra*, 199 Cal.App.4th at p. 859.)

III

*Due Process Violation:  Merits of the Dismissal Order*

In dismissing the criminal charges against defendants, the trial court was persuaded that the federal government's refusal to produce potentially exculpatory evidence violated defendants' due process rights.  The district attorney contends the trial court erred because neither due process nor any other constitutional provision compelled dismissal under the circumstances here.  We agree.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.  The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."  (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294.)  "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's

19

witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (*Washington v. Texas* (1967) 388 U.S. 14, 19.)

However, "more than the mere absence of testimony is necessary to establish a violation of the right." (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 867 (*Valenzuela-Bernal*).) "[T]he constitutional right to compulsory process is not 'an unfettered right to offer testimony' that 'automatically and invariably outweigh[s] countervailing public interests.' [Citation.] A defendant claiming a violation of this right must establish both that he was deprived of the opportunity to present material and favorable evidence and that the deprivation was arbitrary or disproportionate to any legitimate purpose." (*People v. Bryant, Smith, and Wheeler* (2014) 60 Cal.4th 335, 367 (*Bryant*); accord, *Holmes v. South Carolina* (2006) 547 U.S. 319, 324 (*Holmes*).)

Pertinent to the circumstances here, our Supreme Court has recognized that the traditional jurisdictional limits of a state court, under our federal system, do not violate due process. "[A]s the compulsory process of a court ordinarily runs only to those persons who can be located within its jurisdiction, the *constitutional* provisions do not give the defendant a right to compel the attendance of a witness from beyond that jurisdiction." (*People v. Cavanaugh* (1968) 69 Cal.2d 262, 266.)

For example, in circumstances strikingly similar to this matter, our Supreme Court has held that the federal government's refusal to produce potentially exculpatory evidence did not deprive the defendant of a fair trial. (*People v. Parham* (1963) 60 Cal.2d 378, 382 (*Parham*).) In that case, the defendant was placed in a lineup, where he was

20

identified by several witnesses to various robberies. (*Id*. at p. 380.) These witnesses also identified the defendant at trial. (*Ibid*.) The witnesses testified that, after the lineup, they gave signed statements to agents of the Federal Bureau of Investigation (FBI). (*Ibid*.) A local police officer was present during the FBI interviews and took notes. (*Ibid*.) Defense counsel moved for production of the signed statements, but the prosecution did not have access to them. (*Id*. at pp. 380-381.) Defense counsel then subpoenaed an FBI agent. (*Id*. at p. 381.) The agent responded that he could not produce the signed statements or testify about them based on a standing order of the Department of Justice restricting disclosure of information in its files. (*Id*. at p. 381 & fn. 1.)

Citing *Touhy*, *supra*, 340 U.S. 432, our Supreme Court held that the standing order "compelled [the agent] to refuse to produce the F.B.I. file. That order is valid and has the force of federal law. [Citations.] The trial court was therefore bound by the executive order and properly refused to hold [the agent] in contempt." (*Parham*, *supra*, 60 Cal.2d at p. 381, fn. omitted.) The Supreme Court rejected the defendant's argument that admitting the witnesses' testimony, without the production of the prior signed statements, deprived him of a fair trial. It explained, "Had the witnesses' statements been in the possession of the prosecution an order to produce would have been proper. [Citations.] Moreover, had defendant been prosecuted under federal law the statements could have been produced under the Jencks Act. [Citation.] It does not follow, however, that the use of the witnesses' testimony even though their prior statements were unavailable deprived defendant of a fair trial. The prosecution did not withhold the statements, but on the contrary made every effort to obtain them from the F.B.I. The prosecution cannot be

21

penalized because those efforts failed. The prosecution is not penalized if, through no fault of state officials, a material witness for the defense is unavailable at trial. [Citations.] It does not appear that the statements were unavailable because of any improper activity by state officials. The police were under no compulsion to take statements from the witnesses. [Citation.] There is nothing to show that the police conspired with the federal agents to deprive defendant of the statements. The prosecution was therefore entitled to use the testimony of the witnesses even though their signed statements were unavailable." (*Id*. at pp. 381-382.)

Defendants attempt to distinguish *Parham* because local police were present for the FBI interviews and took notes, whereas here the DEA interviewed E.G. before local police became involved. We disagree that this factual distinction affects the applicability of *Parham*. Despite the presence of local police, only the FBI had access to the witnesses' signed statements. (*Parham*, *supra*, 60 Cal.2d at p. 380.) These signed statements were relevant evidence and potentially exculpatory. Our Supreme Court noted that the prosecution could have been ordered to produce the statements if they were in its possession. (*Id*. at pp. 381-382.) The issue in *Parham*, as here, was whether the federal government's refusal to produce relevant and potentially exculpatory evidence violated a defendant's right to a fair trial in a state prosecution. Our Supreme Court held that such refusal does not infringe this right: "The prosecution is not penalized if, through no fault of state officials, a material witness for the defense is unavailable at trial." (*Id*. at p. 382.)

Other state courts that have considered similar issues have come to the same conclusion. For example, in *State v. Vance* (Wash.Ct.App. 2014) 339 P.3d 245, the Court

of Appeals of Washington reversed an order dismissing criminal charges against a defendant based on the federal government's refusal to allow two federal agents to provide testimony or disclose records.  It held, "There is no evidence that the agents were under the State's possession and control or that the State could compel the agents to submit to interviews." (*Id*. at p. 250.)  Likewise, the trial court lacked jurisdiction to compel the federal employees to testify or produce documents.  (*Id*. at p. 252.)  The trial court therefore abused its discretion by finding that the prosecution had violated its discovery obligations.  (*Ibid*.)  Similarly, in *State v. Andrews* (La. 1971) 250 So.2d 359, 367-368, the Louisiana Supreme Court held that a defendant was not denied due process or a fair trial when two federal agents refused to testify based on federal regulations prohibiting disclosure of official information.

In their arguments in favor of a due process violation, defendants focus on the fact that a governmental agency, here the Department of Justice, refused to produce the requested information.  Although they are vague in their reference to due process, the obligation of the government to produce material exculpatory evidence under the due process clause is specific.  It is governed by *Brady*, *supra*, 373 U.S. 83, and its progeny.

"The Fourteenth Amendment to the federal Constitution prohibits states from denying any person due process of law.  [Citation.]  This guarantee of due process affords criminal defendants the right to a fair trial, 'impos[ing] on States certain duties consistent with their sovereign obligation to ensure "that 'justice shall be done.' " '  [Citation.]  [¶] Prosecutors, as agents of the sovereign, must honor these obligations.  [Citations.]  A prosecutor must refrain from using evidence that the prosecutor knows to be false.

23

[Citations.] A prosecutor must correct false evidence 'when it appears.' [Citation.] And, under *Brady*, a prosecutor must disclose to the defense evidence that is 'favorable to [the] accused' and 'material either to guilt or to punishment.' " (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 40; accord, *United States v. Bagley* (1985) 473 U.S. 667, 675 ["The *Brady* rule is based on the requirement of due process."].)

"Under *Brady*, *supra*, 373 U.S. 83, and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence. The duty extends to evidence known to others acting on the prosecution's behalf, including the police." (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709.) "Thus, the prosecution is responsible not only for evidence in its own files but also for information possessed by others acting on the government's behalf that were gathered in connection with the investigation. But the prosecution cannot reasonably be held responsible for evidence in the possession of *all* governmental agencies, including those not involved in the investigation or prosecution of the case. 'Conversely, a prosecutor does not have a duty to disclose exculpatory evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information. Thus, information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material.' " (*In re Steele* (2004) 32 Cal.4th 682, 697.)

Defendants do not contend that the DEA was part of the prosecution team in this case, such that the prosecution was required to disclose information known to the DEA under *Brady*. We likewise see no evidence that the DEA was acting on the prosecution's behalf or as part of a joint investigation of defendants. (See *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 904 [out-of-state law enforcement agencies not part of the prosecution team].) Under *Brady*, no due process violation occurred here.[4]

Eschewing rigorous analysis under *Brady*, defendants contend some other, more general due process violation occurred. "The whole foundation for *Brady*, however, is due process and its requirement that an accused be afforded a fair trial." (*People v. Superior Court* (*Meraz*) (2008) 163 Cal.App.4th 28, 50, fn. 11.) In any event, for reasons we have already discussed, we conclude no general due process violation occurred here because no arbitrary state rule deprived the defendants of their defense. (See *Holmes*, *supra*, 547 U.S. at p. 324; *Bryant*, *supra*, 60 Cal.4th at p. 367.) Under well-settled principles of sovereign immunity, neither the prosecution nor the trial court had the ability to compel testimony or the production of documents by the DEA. This

---

4     Other state courts have likewise found no *Brady* violation where the federal government refuses to provide testimony or produce documents under similar circumstances. (See, e.g., *Diallo v. State* (Md.Ct.App. 2010) 994 A.2d 820, 841; *People v. Rodriguez* (1989) 546 N.Y.S.2d 861, 862.) Federal courts reviewing the habeas claims of state prisoners have come to the same conclusion (see, e.g., *Goff v. Bagley* (6th Cir. 2010) 601 F.3d 445, 474-476; *Mir Aimal Kasi v. Angelone* (4th Cir. 2002) 300 F.3d 487, 504-507), as have federal courts considering federal defendants' *Brady*-related claims regarding potentially exculpatory evidence held by foreign governments (see, e.g., *United States v. Reyeros* (3d Cir. 2008) 537 F.3d 270, 280-285; *United States v. Hughes* (1st Cir. 2000) 211 F.3d 676, 687-689).

25

circumstance did not deprive defendants of a fair trial.  (See *Parham*, *supra*, 60 Cal.2d at p. 382.)

We note that a due process violation may also be found in some cases where a defendant is completely precluded from pursuing his or her principal defense.  (*People v. Masters* (2016) 62 Cal.4th 1019, 1079 (*Masters*).)  The record does not support such a violation here.  As we discuss further below, even without testimony and documents from

the DEA, defendants have ample impeachment evidence against E.G. The absence of any DEA evidence does not preclude them from arguing that E.G. is not credible.[5]

To the extent defendants rely more specifically on the right to compulsory process, confrontation, or cross-examination, we follow our Supreme Court (as we must) in rejecting such reliance: "As we have observed, invocation of the confrontation or compulsory process clauses in a claim involving pretrial discovery 'is on a weak footing' because it is unclear whether or to what extent those constitutional guarantees grant

---

[5] Gracia analogizes the federal government's refusal to disclose information here to a journalist's refusal to disclose information under California's newspersons' shield law (Cal. Const., art. I, § 2; Evid. Code, § 1070). Our Supreme Court has held that the absolute privilege in the shield law "is overcome in a criminal proceeding on a showing that nondisclosure would deprive the defendant of his federal constitutional right to a fair trial." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 805; accord, *Miller v. Superior Court* (1999) 21 Cal.4th 883, 890-891.) To address this situation, the Supreme Court established a two-part test. "At the threshold, the defendant must show 'a reasonable possibility [that] the information will materially *assist his defense*.' [Citation.] If he makes this showing, then the court is to proceed to the second stage of the inquiry and balance the criminal defendant's and the newsperson's rights, considering whether the unpublished information in question is confidential or sensitive, the degree to which the information is important to the criminal defendant, whether there is an alternative source of unpublished information, and whether there are other circumstances which may render moot the need to avoid disclosure." (*Miller*, at pp. 891-892.) To the extent these authorities are relevant at all, they do not assist the defendants. In establishing a second-stage balancing test—and therefore acknowledging that disclosure is not *always* required—our Supreme Court recognized that a criminal defendant's interest in disclosure must yield in certain circumstances to competing interests. It does not support defendants' position that their right to a fair trial will necessarily be violated by the nondisclosure of information here. We disagree with Gracia's suggestion that the threshold inquiry under the shield law, whether there is " 'a reasonable possibility [that] the information will materially assist his defense,' " is the applicable test for violation of his right to a fair trial. The threshold inquiry merely leads to the second-stage balancing test. A court may still determine that disclosure is not required, and a defendant's right to a fair trial is not violated, notwithstanding the threshold determination that the information will materially assist the defense.

27

pretrial discovery rights to a defendant. [Citations.] In *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 [(*Ritchie*)], the defendant unsuccessfully subpoenaed the confidential files of a child protective services agency that had investigated reports of abuse by the defendant's 13-year-old daughter, the alleged victim in the case. When the issue reached the United States Supreme Court, the defendant argued as defendant does now that the Sixth Amendment's confrontation and compulsory process clauses guaranteed him the right to pretrial discovery of information necessary for effective cross-examination at trial. (*Ritchie*, *supra*, at p. 51.) Noting that the applicability of Sixth Amendment principles to the prosecution's production of exculpatory evidence was an unsettled question, the high court declined to address that issue and decided the case 'under the broader protections' of the due process clause. (*Ritchie*, *supra*, at p. 56.) Likewise here, we have examined defendant's claim of error under the 'clear framework for review' provided by *Brady* and its progeny (*Ritchie*, *supra*, at p. 56), and conclude that no constitutional violation occurred. Defendant invites this court to recognize a Sixth Amendment violation when a defendant is denied discovery that results in a significant impairment of his ability to investigate and cross-examine a witness. 'We do not, however, see an adequate justification for taking such a long step in a direction the United States Supreme Court has not gone.' " (*People v. Clark* (2011) 52 Cal.4th 856, 982-983 (*Clark*).)

Here, defendants have likewise failed to show any violation of right to compulsory process, confrontation, or cross-examination. The right to compulsory process is analyzed under the due process framework we have already discussed. (*Ritchie*, *supra*,

28

480 U.S. at p. 56; *Clark*, *supra*, 52 Cal.4th at p. 983; see *Holmes*, *supra*, 547 U.S. at p. 324; *Bryant*, *supra*, 60 Cal.4th at p. 367.) The right to confrontation pertains only to adverse witnesses who offer testimony at trial. There is no indication that the prosecution will call the DEA agents to testify against defendants, so the confrontation clause is not implicated. (See *United States v. Soriano-Jarquin* (4th Cir. 2007) 492 F.3d 495, 505.) It appears the prosecution may call E.G., but defendants have not shown their right to confront or cross-examine him will be violated. " '[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' " (*United States v. Owens* (1988) 484 U.S. 554, 559; accord, *People v. Anderson* (2001) 25 Cal.4th 543, 577, fn. 11 ["[T]he high court has never held that the confrontation clause requires more than the opportunity to *ask the witness* questions pertinent to his or her credibility."]; *People v. Foalima* (2015) 239 Cal.App.4th 1376, 1391.) As noted, our Supreme Court has refused "to recognize a Sixth Amendment violation when a defendant is denied discovery that results in a significant impairment of his ability to investigate and cross-examine a witness." (*Clark*, at p. 983.)

Moreover, even if defendants had shown that the federal government's refusal to allow testimony or produce documents were improper, they have not established a due process or other constitutional violation because they have not shown this evidence was *material* in the constitutional sense. "Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally

infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' " (*Valenzuela-Bernal*, *supra*, 458 U.S. at p. 872.)  The improper limitation of a defendant's ability to present evidence only prevents a fair trial where the evidence is material, i.e., "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." (*Id.* at p. 874.)  " ' "Materiality . . . requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation].  A defendant instead 'must show a "reasonable probability of a different result." ' " ' " (*Masters*, *supra*, 62 Cal.4th at p. 1067.)

The materiality requirement applies even when a defendant does not have access to the evidence at issue.  As the United State Supreme Court has explained, "[W]hile this difference may well support a relaxation of the specificity required in showing materiality, we do not think that it affords the basis for wholly dispensing with such a showing." (*Valenzuela-Bernal*, *supra*, 458 U.S. at p. 870.)  "[C]ourts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself.  Because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence." (*Id.* at p. 874, fn. omitted.)

Even under this relaxed standard, defendants have not shown any evidence obtained from the DEA would be material at trial (and there was no basis for the trial court to make such a finding).  Defendants primarily contend that E.G. may have made

30

exculpatory or inconsistent statements during his DEA interview. But the existence of such statements is entirely speculative—and it would be equally speculative to conclude that E.G. made additional inculpatory or consistent statements, thereby bolstering the prosecution's case at trial. Even if E.G. made exculpatory or inconsistent statements, the significance of any such statements at trial is unknown, both because the statements themselves are unknown and because the evidence to be introduced at trial is also unknown. (See, e.g., *Kwan Fai Mak v. FBI* (9th Cir. 2001) 252 F.3d 1089, 1094.) E.G.'s credibility may not be a dispositive issue. Or, if it is, other evidence may be introduced that impeaches him more effectively than any statements made to the DEA. We note, in this context, that the transcript of the preliminary hearing shows that defendants have ample grounds on which to impeach E.G. At this stage, defendants have not established a constitutional violation.

Defendants claim the prosecution admitted in the trial court that the DEA evidence was material in the constitutional sense. During the hearing on the first motion to dismiss, the prosecutor stated, "I will readily concede that the information that is sought after in this case is *Brady*. It, by definition, includes information that would hurt the prosecution, help the defense, and/or mitigate the situation here." In context, however, the prosecutor was acknowledging that DEA documentation of E.G.'s interview was the type of information that California prosecutors would normally disclose to ensure their *Brady* obligations are met. Indeed, later in his argument, the prosecutor argued that the evidence was *not* material because defendants already had ample impeachment material against E.G.

31

The prosecutor's argument during the second hearing is instructive. He stated, "I am not saying there's *Brady*—that I know for a fact that there's something that shows [E.G.] is lying or that he's wrong or something that shows he's inconsistent. [¶] What I am saying is there is going to be written documentation from the DEA side. I haven't seen it. I don't know what it is. [¶] . . . [¶] There is no doubt in my mind when I say that there is potential *Brady* information or *Brady* information that's out there. I am conceding that, yeah, there's definitely reports and information that could potentially mitigate, exonerate, show discrepancies, show impeachment out there. [¶] I am not saying that there's definitely something out there that, if you had this, would be the smoking gun." It is clear from the record that the prosecution was using "*Brady* information" in the sense that information of that type would normally be disclosed by the prosecution, not that failure to disclose the information would necessarily establish all of the elements of a *Brady* violation, including materiality.

Although we reject defendants' constitutional arguments, we note they are not left without a remedy. They may challenge the federal government's refusal to disclose information in federal district court under the APA (5 U.S.C. § 701 et seq.). (*Williams*, *supra*, 170 F.3d at p. 434; *Elko County*, *supra*, 109 F.3d at p. 557, fn. 1; *Shah v. Dept. of Justice* (D.Nev. 2015) 89 F.Supp.3d 1074, 1079.) "On review, district courts have jurisdiction to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' including action that is 'contrary to constitutional right, power, privilege, or immunity.' 5 U.S.C.A. § 706(2)(A)-(B). In addition, the APA vests the district court with authority to 'compel agency action

32

unlawfully withheld or unreasonably delayed.' 5 U.S.C.A. § 706(1). Therefore, a state criminal defendant, aggrieved by the response of a federal law enforcement agency made under its regulations, may assert his constitutional claim to the investigative information before the district court, which possesses authority under the APA to compel the law enforcement agency to produce the requested information in appropriate cases." (*Williams*, at p. 434.) This procedure complies with the constitution and provides a forum for the defendants to assert their claim to information in the possession of the DEA. (See *Donatoni v. Dept. of Homeland Security* (E.D.Va. 2016) 184 F.Supp.3d 285, 289.)[6]

At base, a due process violation may be found where a rule " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' [Citations.] Fundamental principles of justice are those that ' " 'lie at the base of our civil and political institutions' " ' and ' "define 'the community's sense of fair play and decency.' " ' " (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 11.) As discussed in this opinion, these fundamental principles do not exist in a vacuum. Established federal and state precedent guides courts in identifying and applying them. The trial court here was rightly concerned with the defendants' ability to

---

[6] In light of our conclusion that defendants have not established any constitutional violation, we need not consider the district attorney's argument that defendants *must* pursue a challenge under the APA before they can assert any such violation. (See *Taylor v. Illinois* (1988) 484 U.S. 400, 410 ["There is a significant difference between the Compulsory Process Clause weapon and other rights that are protected by the Sixth Amendment—its availability is dependent entirely on the defendant's initiative."]; *People v. Jacinto* (2010) 49 Cal.4th 263, 273-274.)

obtain a fair trial.  But it erred by not correctly interpreting that right under established case law.

DISPOSITION

The dismissal order is reversed.


GUERRERO, J.

WE CONCUR:



McCONNELL, P. J.



O'ROURKE, J.